[No. D037390. Fourth Dist., Div. One. July 29, 2003.]

ST. PAUL MERCURY INSURANCE COMPANY, Plaintiff, Cross-defendant and Appellant, v.
FRONTIER PACIFIC INSURANCE COMPANY et al., Defendants, Cross-complainants and Appellants;
AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, Defendant and Appellant;
SCHUFF STEEL COMPANY, Cross-defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

* The opinion filed July 29, 2003, is ordered certified for publication with the exception of parts IV and V.

1236

## COUNSEL

Neumeyer & Boyd, Carol A. Boyd and Larry Nathenson for Plaintiff, Cross-defendant and Appellant.

Joseph R. Zamora for Defendants, Cross-complainants and Appellants.

Anderson, Bonnifield & Cottle, Sean A. Cottle and Kent C. Parr for Defendant, Cross-complainant and Appellant Bigge Crane and Rigging Company, Inc.

McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Wagoner, Wendy S. Lloyd and Jay A. Christofferson for Defendant and Appellant.

Royce, Grimm, Vranjes, McCormick & Graham; Grimm, Vranjes, McCormick & Graham, Mark Vranjes and Gregory D. Stephan for Cross-defendant and Respondent.

## OPINION

McCONNELL, J.—This action involves contribution claims among insurers, arising from the settlement of complaints filed after a fatal crane accident. St. Paul Mercury Insurance Company (St. Paul) insured Bigge Crane and Rigging Company (Bigge) as an additional insured under the liability policy of Schuff Steel Company (Schuff), which rented the crane from Bigge. Additionally, Frontier Pacific Insurance Company (Frontier) and American International Specialty Lines Insurance Company (AISLIC) covered Bigge under primary and excess policies, respectively.

St. Paul persuasively contends the trial court erred by interpreting ambiguous terms in St. Paul's policy against it to cover Bigge for its own negligence and strict products liability, as Bigge had no objectively reasonable expectation of such coverage. Frontier, AISLIC and Bigge persuasively contend the court erred by refusing to allocate fault for the underlying accident between Schuff and Bigge, since that is the only means of determining whether St. Paul's policy is primary to Frontier's policy for any portion of the settlement. We reverse the November 30, 2000 judgment on St. Paul's complaint against Frontier, AISLIC and Bigge, and Frontier's cross-complaint against St. Paul, insofar as it concerns these findings, and remand the matter with instructions. In all other respects, we affirm the judgment.

This case also involves Frontier's and Bigge's cross-complaint against Schuff for breach of contract and related causes of action, based on Schuff's alleged failure to obtain the amount of primary insurance for Bigge required under the crane lease. Frontier and Bigge contend the court erred by rendering judgment for Schuff. Bigge, however, has not shown it was damaged by any breach of contract, and Frontier has not shown it is an express third party beneficiary under the lease. Accordingly, we affirm the January 18, 2001 judgment for Schuff.

### FACTUAL AND PROCEDURAL BACKGROUND

In January 1996 Schuff entered into a Bare Equipment Lease Agreement[1] (the Lease) with Bigge to rent a crane. Schuff was a subcontractor of Robert B. Bayley Construction, Inc. (Bayley), the general contractor on the Fashion Valley Center (Fashion Valley) expansion in San Diego, and needed the crane to place steel beams.

Paragraph 8 of the Lease, titled "HOLD HARMLESS–INSURANCE–LESSEE," required Schuff to indemnify Bigge against claims for injury or death

---

[1] "A 'bare' rental agreement involves equipment only without providing an operator." (*Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1799, fn. 4 [34 Cal.Rptr.2d 732] (*Hernandez*).)

"in any way *caused by* [*Schuff*] ... occasioned by the use, maintenance, operation, handling, transportation or storage of the equipment during the rental term." (Italics added.) The provision also required Schuff to obtain $2 million in liability insurance to protect Bigge from "*such liability* and risk of loss," and to "furnish additional insured endorsements making *such coverages* primary to all other coverages." (Italics added.)

Schuff was insured under a commercial general liability (CGL) and excess liability policy issued by St. Paul. The policy contained an "Additional Protected Persons Endorsement" (APP endorsement), which provided coverage for injury or damage resulting from Schuff's maintenance, operation or use of the crane. The endorsement exclude coverage for injury or damage "that results from any act or failure to act of [Bigge], other than the general supervision of work performed for [Bigge] by [Schuff]."[2]

St. Paul also issued a separate "2010 endorsement," which named Bigge as an additional insured and referred to the Fashion Valley project, but stated the policy provided coverage to Bigge "only with respect to liability arising out of [Schuff's] operations performed for [Bigge]." The policy had per occurrence limits of $1 million and aggregate, or "per project," limits of $2 million, and umbrella coverage of $1 million. The policy limit for any additional insured, however, was not greater than the limits of liability required in the indemnity contract.

Schuff provided Bigge with a certificate of insurance showing it was an additional insured under the St. Paul policy "with respect to [Schuff's] rental of [a] crane from" Bigge. The certificate described Schuff's "operations" as the Fashion Valley project.

Bigge was also a named insured under a CGL policy issued by Frontier, with per occurrence and aggregate limits of $1 million, and under an umbrella policy issued by AISLIC, with limits of $9 million. The AISLIC policy identifies the Frontier policy as the underlying liability insurance.

---

[2] The APP endorsement provides in part:

"Additional Protected Persons. Any person or organization you are required in a written contract to show as an additional protected person is an additional protected person. But only for covered injury or damage that results from: [¶]—premises you own, rent or lease; [¶]—the maintenance, operation or use of equipment they lease to you; or [¶]—your work for them; or [¶]—their general supervision of that work. [¶] ... [¶]

"We won't cover bodily injury or property damage: [¶] ... [¶]—that results from any act or failure to act of the additional protected person or any of their [*sic*] employees, other than the general supervision of work performed for the additional protected person by you. [¶] ... [¶]

"If the additional protected person is an equipment lessor, we won't cover injury or damage that: [¶]—results from their sole negligence; or [¶]—happens after the equipment lease ends."

In June 1996 a Schuff employee, Wayne Cvitkovich, was killed when a steel beam fell from the crane and struck him. Cvitkovich's wife and children sued Bigge for negligence, strict products liability and spoliation of evidence. The plaintiffs alleged Bigge negligently inspected and maintained the crane, the crane was defective and "the load line holding the beam failed allowing the beam to descend while still attached to the line." The Cvitkoviches also sued Bayley.

Additionally, Schuff's crane operator, Dwight Bennett, sued Bigge for negligence and intentional and negligent infliction of emotional distress. Bennett alleged the crane malfunctioned and he sustained injuries when he tried to prevent the steel beam from falling and when Schuff employees attacked him after the accident. Bennett also named as defendants Bayley and Schuff, alleging supervisors of those companies "illegally ordered" him to disconnect the horn on the crane, and thus he "was unable to warn ironworkers working below that the steel beam held aloft by the crane was ... rapidly descend[ing] down on them." Bennett's wife joined in the suit and alleged loss of consortium.

Another Schuff employee, James Alvernaz, sued Bigge for negligence and negligent infliction of emotional distress. Alvernaz alleged the crane was unsafe and he was standing near Cvitkovich when the accident occurred and "seriously injured his wrist as he reeled backwards." Alvernaz also named as defendants Bayley and Schuff, alleging their employees ordered Bennett to disconnect the crane's horn "because individuals residing near Fashion Valley were complaining about the noise level at the construction site."

The three cases were consolidated (the underlying litigation). As the plaintiffs' employer, Schuff was dismissed from the action.[3]

Frontier initially defended Bigge in the underlying litigation. However, Frontier withdrew its defense when St. Paul agreed to participate in Bigge's defense. Frontier and AISLIC refused to participate in settlement negotiations.

St. Paul filed this action against Frontier and Bigge for declaratory relief and contribution, seeking a reallocation of any settlement among the insurers.[4] St. Paul later added AISLIC as a defendant. Frontier cross-complained against St. Paul for declaratory relief. Additionally, Frontier and Bigge cross-complained against Schuff for breach of contract and related counts, alleging that if it were determined the St. Paul policy did not cover Bigge's

---

[3] Under state workers' compensation law employers are immune from suit by employees injured on the job. (*Hernandez, supra,* 28 Cal.App.4th at p. 1810; Lab. Code, § 3602.)

[4] St. Paul sought no recovery against Bigge, but assertedly sued it as a "necessary party."

exposure for its own negligence or strict products liability, or provide $2 million in primary insurance, Schuff breached its obligations under the Lease.

The court in this case ordered Frontier to attend settlement negotiations in the underlying litigation. The plaintiffs accepted a total of $2,675,000 for their claims against Bigge. Of that amount, St. Paul paid $1,925,000 and Frontier paid $750,000. Additionally, St. Paul paid a total of $55,000 for claims against Bayley, which was an additional insured under Schuff's policy.

In this case, St. Paul moved for summary adjudication, seeking a ruling Frontier shared in the duty to defend Bigge in the underlying litigation. Frontier moved for summary judgment on the complaint and its cross-complaint, arguing St. Paul's policy was primary to Frontier's policy, and thus St. Paul had the sole defense obligation and was required to indemnify Bigge for the first $2 million paid in settlement of the underlying litigation. AISLIC moved for summary judgment on the complaint, arguing that as an excess carrier it had no duty to defend Bigge. Bigge joined in Frontier's and AISLIC's motions.

The court granted St. Paul's motion and denied Frontier's and AISLIC's motions. The court determined the coverage provisions of the St. Paul policy and additional insured endorsements were ambiguous, and construed them against St. Paul "to cover Bigge for the negligence of Schuff or Bigge, plus products liability." However, the court found the indemnity provision in the Lease governed whether St. Paul's policy was primary to Frontier's policy. The court ruled that since the indemnity provision obligated Schuff to indemnify Bigge only for claims arising from Schuff's negligence, "St. Paul's policy was primary [over Frontier's policy] only to the extent the damage was caused by Schuff's negligence."

During a bench trial, the court allowed St. Paul to amend its complaint to seek contribution from Frontier and AISLIC for the settlement of the underlying litigation. The court initially intended to allow evidence regarding the comparative fault of Schuff and Bigge, to determine whether St. Paul's policy was primary over Frontier's policy for any portion of the settlement. However, the court ultimately refused to conduct a " 'trial within a trial.' " Rather, the court presumed 100 percent of the settlement was solely for Bigge's own negligence or strict products liability, as opposed to including an exposure for Schuff's negligence on a joint and several basis. The court made the presumption irrebuttable absent evidence the insurers expressly agreed to apportion fault in this action, and there was no such evidence.

The court determined there was "a single 'occurrence' or 'event' for all claims arising out of the same accident." The court found St. Paul's policy is

not primary to Frontier's policy for any portion of the settlement, based on its presumption the settlement was only for Bigge's negligence or strict products liability. Rather, St. Paul and Frontier are Bigge's co-primary insurers and obligated to pay their respective $1 million policy limits. The court found St. Paul and AISLIC are co-excess insurers and each is responsible for one-half of the $730,000 in excess liability. Additionally, the court found St. Paul and Frontier each responsible for one-half of Bigge's defense costs. The court ordered Frontier to pay St. Paul the remainder of its policy limit, $250,000, plus $211,656 for defense costs, and AISLIC to pay St. Paul $365,000. Judgment on St. Paul's complaint and Frontier's cross-complaint was entered on November 30, 2000.

Further, on January 18, 2001, the court entered judgment for Schuff on Frontier and Bigge's cross-complaint. The court found Schuff satisfied the Lease by "procur[ing] the requisite insurance coverage for [Bigge] ... in the underlying [litigation]" and by "provid[ing] the defense and indemnity of [Bigge]."

## DISCUSSION

### I

### *Standard of Review*

When the facts are undisputed, as here, the interpretation of contractual obligations is a purely legal matter subject to our independent review. (*Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 504 [61 Cal.Rptr.2d 668].)

### II

### A

### *The Indemnity Agreement and Bigge's Expectation of Coverage*

St. Paul contends the court erred by interpreting ambiguous coverage terms against it to cover Bigge for claims arising from its own negligence or strict products liability. St. Paul asserts the court should have first considered Bigge's objectively reasonable expectations of coverage, and given the indemnity provision in paragraph 8 of the Lease Bigge had no such expectation. For reasons explained, we agree.

Insurance policies are construed under the same rules that govern the interpretation of other contracts. Accordingly, St. Paul's policy must be interpreted to give effect to the mutual intent of the parties at the time of contracting, and such intent is ascertained, if possible, from the " 'clear and explicit' " language of the contract. (*St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038, 1048 [124 Cal.Rptr.2d 818] (*American Dynasty*); *Continental Heller Corp. v. Amtech Mechanical Services, Inc., supra,* 53 Cal.App.4th at p. 504.) If contractual language is clear and explicit, it governs. On the other hand, when policy language is ambiguous, rules applicable to resolving ambiguity control. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264–1265 [10 Cal.Rptr.2d 538, 833 P.2d 545] (*Bank of the West*).)

" 'An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are reasonable.' " (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) Coverage provisions "must be construed in the context of the policy as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] The proper question is whether the particular phrase is ambiguous in 'the context of *this* policy and the circumstance of *this* case.' [Citation.] This question must be answered through the eyes of a reasonable person in the position of the insured. [Citation.] 'Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.' " (*American Dynasty, supra,* 101 Cal.App.4th at p. 1056.)

The APP endorsement in St. Paul's policy covers Bigge for claims arising from Schuff's negligence and excludes claims arising from Bigge's acts or omissions. The court presumably found coverage terms ambiguous because St. Paul also issued the 2010 endorsement, which refers to the Fashion Valley project, but covers Bigge as an additional insured "only with respect to liability *arising out of* [Schuff's] ongoing operations performed for [Bigge]." (Italics added.)

The "arising out of" language has been broadly interpreted in favor of coverage for the additional insured for its own wrongdoing. In *Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321 [81 Cal.Rptr.2d 557] (*Syufy*), a theater owner hired an electrical contractor to upgrade lighting and temperature controls. The contractor added the owner as an additional insured on its CGL policy, and the endorsement provided the additional coverage was " '… only with respect to liability arising out of [the contractor's work] for that insured by or for [the contractor].' " (*Id.* at p. 324.) During construction,

one of the contractor's employees was injured at the theater when he climbed through a defective roof hatch to leave work. The contractor's insurer paid $400,000 to settle the matter on behalf of the owner, and then filed an equitable contribution action against the owner and the owner's excess insurer.

The appellate court affirmed a summary judgment granted in favor of the owner and its insurer, holding that "when an insurer ... grants coverage for liability 'arising out of' the named insured's work, the additional insured is covered without regard to whether injury was caused by the named insured or the additional insured." (*Syufy, supra,* 69 Cal.App.4th at p. 330.) The court explained that "California courts have consistently given a broad interpretation to the terms 'arising out of' or 'arising from' in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship." (*Id.* at p. 328; see also *Fireman's Fund Ins. Cos. v. Atlantic Richfield Co.* (2001) 94 Cal.App.4th 842, 851 [115 Cal.Rptr.2d 26] [sufficient causal connection to cover owner/additional insured when employee of contractor/named insured was injured on owner's defective wooden steps while performing work for contractor].)

Ordinarily, a reasonable layperson would not interpret the 2010 endorsement language "only with respect to liability arising out of [Schuff's] ongoing operations *performed for [Bigge]*" (italics added), as embracing Schuff's operations performed for a third party (Bayley) unrelated to Bigge. Similar endorsements are issued when, for instance, a named insured/contractor is to perform work at the additional insured's/owner's premises. (See, e.g., *Syufy, supra,* 69 Cal.App.4th at p. 324; *Fireman's Fund Ins. Co. v. Atlantic Richfield Cos., supra,* 94 Cal.App.4th at p. 851.) However, the 2010 endorsement is ambiguous in context because it covers Bigge for claims arising from Schuff's work for Bigge, but no such work was contemplated. The meaning of the 2010 endorsement cannot be ascertained from its plain terms. Moreover, the APP endorsement and the 2010 endorsement cannot be reconciled without essentially rendering one or the other superfluous. An ambiguity results "when 'there is contradictory or necessarily inconsistent language in different portions of the instrument; ...' " (*Delgado v. Heritage Life Ins. Co.* (1984) 157 Cal.App.3d 262, 271 [203 Cal.Rptr. 672]; *Smith Kandal Real Estate v. Continental Cas. Co.* (1998) 67 Cal.App.4th 406, 416 [79 Cal.Rptr.2d 52].)

In resolving ambiguity, "we must first attempt to interpret the ambiguous provision in the sense the insurer believed the insured would reasonably and objectively have understood it when the policy was issued." (*Syufy, supra,* 69

Cal.App.4th at p. 326.)[5] "This rule ... protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' [Citation.] Only if this rule does not resolve the ambiguity do we then resolve it against the insurer." (*Bank of the West, supra,* 2 Cal.4th at p. 1265.) The "disputed policy language must be examined *in context* with regard to its intended function in the policy. [Citations.] This requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and 'common sense.' " (*American Dynasty, supra,* 101 Cal.App.4th at p. 1058, citing *Bank of the West, supra,* 2 Cal.4th at p. 1276.)

■ When additional insured endorsements, by their own terms, depend on the existence of a written contract between the named insured and the additional insured, the contract is a significant circumstance in determining the objectively reasonable expectations of the additional insured. This is true whether or not the insurer ever actually read the contract. (*American Dynasty, supra,* 101 Cal.App.4th at p. 1059.)

The 2010 endorsement and the certificate of insurance refer to Schuff's Fashion Valley project. Further, the certificate of insurance notes Bigge was an additional insured "with respect to [Schuff's] rental" of the crane for the Fashion Valley project. Additionally, the APP endorsement covers Bigge as an "organization you [Schuff] are required *in a written contract* to show as an additional protected person." (Italics added.) Frontier, in fact, concedes the "insurers' obligations were controlled by the indemnity agreement." By naming Bigge as an additional insured, St. Paul was obviously aware Schuff was adding Bigge to its policy because it was contractually obligated to do so. Under the circumstances, paragraph 8 of the Lease is instrumental in assessing Bigge's objectively reasonable expectations. (*American Dynasty, supra,* 101 Cal.App.4th at p. 1059.)

■ Paragraph 8 of the Lease requires Schuff to indemnify Bigge for claims for injury or death "in any way *caused by [Schuff]*," in its "use, maintenance, operation, handling, transportation or storage" of the crane.[6]

---

[5] Contrary to St. Paul's assertion, we are concerned with Bigge's, not Schuff's, objectively reasonable expectations. (See *American Dynasty, supra,* 101 Cal.App.4th at p. 1058.)

[6] In *MacDonald & Kruse, Inc. v. San Jose Steel Co.* (1972) 29 Cal.App.3d 413 [105 Cal.Rptr. 725] the court identified three classifications of indemnity contracts. The indemnity clause in the Lease, which requires Schuff to indemnify Bigge for Bigge's liability caused by Schuff, is similar to the third class described in *MacDonald & Kruse* as "that which provides that the indemnitor is to indemnify the indemnitee for the indemnitee's *liabilities caused by the indemnitor,* but which does not provide that the indemnitor is to indemnify the indemnitee for the indemnitee's liabilities that were caused by other than the indemnitor." (*Id.* at p. 420.) The *MacDonald & Kruse* court explained that under such a provision, active or passive negligence of the indemnitee bars indemnification against the indemnitor even if the indemnitor also caused the injury. (*Ibid.*) However, "this court has eschewed a 'mechanical application' of the

(Italics added.) In *Hernandez,* this court held that substantively identical language required the lessee of a crane to indemnify the lessor only for the portion of the joint and several economic damage award to plaintiffs attributable to the lessee's negligence. (*Hernandez, supra,* 28 Cal.App.4th at pp. 1818, 1822.) Accordingly, Schuff's fault is a prerequisite of contractual indemnity. "The indemnity language ... does not evidence a mutual understanding of the parties that the [indemnitor] would indemnify the [indemnitee] even if its work was not negligent. Indemnity provisions are to be strictly construed against the indemnitee, and had the parties intended to include an indemnity provision that would apply regardless of the [indemnitor's] negligence, they would have had to use specific, unequivocal contractual language to that effect." (*Heppler, supra,* 73 Cal.App.4th at p. 1278.)

Further, the 2010 endorsement is restricted to *Schuff's* "ongoing operations," and as Schuff was not to perform any work for Bigge, the endorsement does not show the liability coverage was intended to be more expansive than Schuff's promise of indemnity. "We cannot conceive of how [Bigge] could have had, *objectively or reasonably,* a contrary expectation." (*American Dynasty, supra,* 101 Cal.App.4th at p. 1059.)[7] This is particularly true insofar as the strict product liability claim against Bigge is concerned, as the "purpose of imposing strict liability is to ensure the costs of injuries resulting from defective products are placed on the manufacturer and others [including lessors] who place the product on the market." (*San Diego Hospital Assn. v. Superior Court* (1994) 30 Cal.App.4th 8, 15–16 [35 Cal.Rptr.2d 489]; *Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1742 [22 Cal.Rptr.2d 781].)

Because Bigge had no reasonable expectations of coverage for its own negligence or strict products liability, the trial court erred by construing the

---

*MacDonald & Kruse* rule, emphasizing instead a contractual interpretation." (*Heppler v. J. M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1276 [87 Cal.Rptr.2d 497] (*Heppler*).) In *Hernandez, supra,* 28 Cal.App.4th 1791, we held the indemnitee under a type III indemnity agreement was entitled to indemnification despite its own negligence, because, among other considerations, the indemnitor's liability arose in part "from precisely the contemplated risk against which the indemnitee was promised protection." (*Id.* at pp. 1821–1822.)

[7] In *Hernandez, supra,* 28 Cal.App.4th 1791, this court observed, in dictum, that the indemnitor's obligations to indemnify and provide insurance "were not necessarily coextensive." (*Id.* at p. 1817.) In *Hernandez,* the indemnity agreement did not expressly require the indemnitor to name the indemnitee as an additional insured under the indemnitor's liability policy. The indemnitor nonetheless provided the indemnitee with certificates of insurance naming the indemnitee an additional insured, and the indemnitor conceded the certificates modified the parties' indemnity agreement. Under that circumstance, we explained the insurance coverage may be broader than the indemnity obligation because the indemnitee changed its position in reliance on certificates of insurance. (*Ibid.*) Here, Bigge points to no evidence it detrimentally relied on the 2010 endorsement. Further, Bigge would not reasonably have changed its position in reliance on the 2010 endorsement, as the parties did not intend for Schuff to perform any work for Bigge.

ambiguity against St. Paul.[8] In accordance with the APP endorsement and paragraph 8 of the Lease, St. Paul's policy covers Bigge only for liability arising from Schuff's negligence. Bigge is thus contractually entitled to indemnification from Schuff, and coverage from St. Paul as the primary insurer, for any portion of the underlying plaintiffs' economic damages attributable to Schuff's fault that Bigge may have paid in settlement on a joint and several basis. (*Hernandez, supra,* 28 Cal.App.4th at p. 1822; *Maryland Casualty Co. v. Bailey & Sons, Inc.* (1995) 35 Cal.App.4th 856, 868 [41 Cal.Rptr.2d 519].) Therefore, Frontier and AISLIC are Bigge's sole primary and excess carriers, respectively, for the settlement amount attributable to its own negligence or strict products liability.

St. Paul contends this holding means its policy provides Bigge no coverage, as the trial court presumed the settlement of the underlying litigation was solely for Bigge's negligence or strict products liability. However, as discussed below, we conclude the court's presumption was incorrect and the matter must be remanded for a trial on allocation of fault.

### B

Frontier, AISLIC and Bigge contend the court erred at trial by excluding evidence that Schuff and Bigge entered into an indemnity agreement other than that set forth in paragraph 8 of the Lease. Frontier produced evidence the Lease included the statement, "[t]his lease agreement incorporates Schuff ... Purchase Order # 83874 in its entirety," and Schuff and Bigge initialed the statement; Schuff's purchase order No. 83874 stated the "[a]ttached letters dated 1/10/96 [the January 10 letter] and 1/30/96 are part of this purchase order, and the reverse side of a page of the January 10 letter included several conditions, including the following: Contractor/Owner will indemnify Bigge against loss or expense, including cost of defense, by reason of liability imposed by law for damages resulting from death or injury to persons or destruction of property occurring during the performance of the work under any contract made on the basis of this proposal, *except to the extent that such death, injury or damage shall have been solely due to the negligent act or willful misconduct of Bigge,* its agents or employees...." (Italics added.)

---

[8] In support of its motion for summary judgment, Frontier submitted the declaration of Roger Simpson, a manager for Bigge. Simpson stated it "was Bigge's intention to receive from Schuff insurance coverage for liabilities that might arise from Schuff's use of the crane." It is unclear whether Simpson meant Bigge expected coverage for its own negligence and strict products liability. In any event, the declaration, at most, evidences only Bigge's subjective intent. "A party's *unexpressed* subjective intent or understanding is inadmissible to prove an intent different from either the express terms of a written agreement or the parties' mutual understanding." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶ 4:67, p. 4-25; *Sunniland Fruit, Inc. v. Verni* (1991) 233 Cal.App.3d 892, 898 [284 Cal.Rptr. 824].)

We conclude the court's ruling was proper. In its first and second amended cross-complaints against St. Paul, Frontier quoted the language of paragraph 8 of the Lease as setting forth the indemnity agreement between Schuff and Bigge. Additionally, in their complaint and first amended cross-complaint against Schuff, Frontier and Bigge quoted paragraph 8 of the Lease in its entirety in support of the allegation Schuff was required to obtain insurance to protect Bigge. Frontier and Bigge claim their quote of paragraph 8 was unrelated to indemnity, but the insurance obligation arises directly from the indemnity obligation.

In summary judgment or summary adjudication proceedings, "[a]dmissions of material facts made in an opposing party's pleadings are binding on that party as 'judicial admissions.' They are *conclusive* concessions of the truth of those matters, are effectively removed as issues from the litigation, and may not be contradicted, by the party whose pleadings are used against him or her." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2002) ¶ 10:147, p. 10-49; *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 222, fn. 3 [31 Cal.Rptr.2d 525]; *Brown v. City of Fremont* (1977) 75 Cal.App.3d 141, 146 [142 Cal.Rptr. 46].) " '[A] pleader cannot blow hot and cold as to the facts positively stated.' " (*Brown v. City of Fremont, supra,* at p. 146.) Accordingly, Frontier and Bigge are bound by their judicial admissions.

Moreover, all parties relied exclusively on paragraph 8 of the Lease until the time of trial. In a separate statement in support of its motion for summary adjudication on Frontier's duty of defense, St. Paul quoted paragraph 8 of the Lease as setting forth the indemnity agreement between Schuff and Bigge. Notably, AISLIC and Bigge filed oppositions to the motion, as well as Frontier. In their responsive separate statements, AISLIC and Frontier did not dispute the accuracy of St. Paul's quote, but stated it did not quote the entire agreement. Frontier submitted all documents arguably part of the Lease, including the January 10 letter, but no party alerted the court to the indemnity provision in the letter.

■ Contrary to the suggestion of Frontier, AISLIC and Bigge, the trial court has no burden to search through the parties' evidence for a triable issue of fact. The parties' separate statements "are intended to permit the judge *to determine quickly* whether the motion is supported by sufficient undisputed facts. If the opposing statement disputes an essential fact alleged in support of the motion, the judge merely has to review the evidence cited in support of that fact. This saves the judge from having to review all the evidentiary materials filed in support of and in opposition to the motion." (Weil & Brown, Cal. Practice Guide: Civil Proceedings Before Trial, *supra,* ¶ 10:94.1,

p. 10-32.) Further, during the hearing Frontier presented a board displaying the language of paragraph 8 of the Lease and the parties relied on it in argument.

Ordinarily, parties may not relitigate issues summarily adjudicated. (*Abadjian v. Superior Court* (1985) 168 Cal.App.3d 363, 370 [214 Cal.Rptr. 234].) "If a motion for summary adjudication is granted, *at the trial of the action,* the cause or causes of action within the action, affirmative defense or defenses, claim for damages, or issue or issues of duty as to the motion which has been granted *shall be deemed to be established* and the action shall proceed as to the cause or causes of action, affirmative defense or defenses, claim for damages, or issue or issues of duty remaining." (Code Civ. Proc., § 437c, subd. (n)(1), italics added.) "[T]he policy behind summary adjudication motions [is] 'to "promote and protect the administration of justice, and to expedite litigation by the elimination of needless trials." ' " (*Catalano v. Superior Court* (2000) 82 Cal.App.4th 91, 97 [97 Cal.Rptr.2d 842]; *Federal Deposit Ins. Corp. v. Superior Court* (1997) 54 Cal.App.4th 337, 344 [62 Cal.Rptr.2d 713].)

■ However, an exception to this rule may apply when an insurer's duty to defend has been summarily adjudicated. Frontier, AISLIC and Bigge rely on *Liberty Mutual Ins. Co. v. Superior Court* (1997) 58 Cal.App.4th 617 [68 Cal.Rptr.2d 219] (*Liberty Mutual*), in which the court explained that a summary adjudication on an insurer's duty to defend "is 'ephemeral' because an insurer may obtain summary adjudication of no duty to defend 'at *any time*' it can conclusively eliminate the potential for coverage." (*Id.* at p. 621, citing *Haskel, Inc. v. Superior Court* (1995) 33 Cal.App.4th 963, 978 [39 Cal.Rptr.2d 520] (*Haskel*).) In *Haskel*, the issue was whether the insured's motion for summary adjudication on duty to defend could be delayed until the insurer had a full opportunity to investigate and prepare. The court held no delay is available, but if a motion is granted the insurer may "thereafter continue to search for and develop evidence that will ultimately enable them to conclusively defeat [the insured's] coverage claim." (*Haskel, supra,* at p. 978.)

In *Liberty Mutual,* the court declined to interpret *Haskel, supra,* 33 Cal.App.4th 963, as requiring that an insurer's subsequent motion to defeat the duty of defense be based on " 'newly discovered facts.' " (*Liberty Mutual, supra,* 58 Cal.App.4th at pp. 621–622.) The court found such a rule unworkable, as evidenced by the facts there—policy periods spanning 25 years, more than 45 million pages of documents, numerous actions against the insureds arising from contamination at approximately 80 sites, as well as other complexities. (*Id.* at pp. 622–623.)

■ Here, in contrast, the only documents relevant to the indemnity issue are the Lease and its attachments, including the January 10 letter, all of which were submitted during the summary adjudication proceedings. *Liberty Mutual* does not stand for the proposition that insurers may rely on one indemnification provision during summary adjudication proceedings, and then, dissatisfied with the result, relitigate the issue in reliance on another provision of which they were, or should have been, aware.

Further, there is no merit to the claim "the court's interpretation of [paragraph 8 of the Lease] with respect to Frontier's duty to defend has no bearing on any of the parties' indemnity obligations." A duty to defend arises if there is a potential for coverage under the policy, and that determination depends on the indemnity agreement between Schuff and Bigge. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [861 P.2d 1153].)

Additionally, no party raised the January 10 indemnity provision in the August 4, 2000 joint trial readiness conference report.[9] Rather, as to legal issues *not* in dispute, the parties stipulated as follows: "A motion for summary adjudication was granted in favor of St. Paul, establishing that Frontier had a duty to defend Bigge in the underlying cases, *and that St. Paul's policy was primary to Frontier's only as to the portion of Bigge's liability which was caused by Schuff as provided in the lease crane agreement.*" (Italics added; some capitalization omitted.) The court indisputably relied on the indemnity provision in paragraph 8 of the Lease in determining whether St. Paul's policy was primary.

The parties did not bring the indemnity provision in the January 10 letter to the court's attention until they filed trial briefs on August 18 (Frontier and Bigge) and August 21, 2000 (AISLIC), a week or less before trial commenced, and they offered no explanation for their untimeliness or shift in theory. The record contains no explanation for the failure to raise the issue earlier, and on appeal Frontier, AISLIC and Bigge assert they overlooked it.[10] However, they did not move for any relief under Code of Civil Procedure section 473 on the ground of their or their counsels' "mistake, inadvertence, surprise, or excusable neglect." (Code Civ. Proc. § 473, subd. (b); Weil & Brown, Cal. Practice Guide: Civil Proceedings Before Trial, *supra,* ¶ 10:149, pp. 10-49 to 10-50.) The court was understandably piqued, and noted that "[i]f I were to visit this new indemnity provision argument, I would ... be in the position of then opening the case to oral testimony as to what was the

---

[9] This document is not included in the appellate record, but we have taken judicial notice of the superior court file. (Evid. Code, § 452, subd. (d).)

[10] We asked the parties for supplemental briefing on the judicial admissions issue, and we have taken their responses into consideration.

intent of the parties because it clearly creates a much larger ambiguity than we had before since the two [indemnity] provisions conflict."

The mandatory trial, readiness conference report is designed to "limit issues for trial." (Super. Ct. San Diego County, Local Rules, Div. II, rule 2.15.) "Failure to disclose and identify all trial exhibits and witnesses intended to be called at trial *and all other items required by the report may, in the court's discretion, result in exclusion or restriction of use at trial.*" (*Ibid.*, italics added.) Items required by the report include issues in dispute and issues not in dispute. (*Id.* at append. B.) " 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) The court did not abuse its discretion by excluding evidence in support of an issue not divulged in the report.

Further, " ' "[t]he doctrine of judicial estoppel ... is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process.... 'The policies underlying preclusion of inconsistent positions are "general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings." ' " ' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 [70 Cal.Rptr.2d 96].) "[I]t has long been settled that '[o]ne to whom two inconsistent courses of action are open and who elects to pursue one of them is afterward precluded from pursuing the other.' " (*Id.* at p. 182.) Although "the doctrine 'cannot be invoked where the position first assumed was taken as a result of ignorance or mistake,' " (*ibid.*) the parties here raised no such defense. We find no abuse of discretion or other error.

### III

#### *Allocation of Fault Between Schuff and Bigge*

Under paragraph 8 of the Lease, Schuff was required to obtain $2 million in insurance to protect Bigge from liability for Schuff's negligence, and the insurance was to be "primary to all other coverages." In the summary adjudication proceedings, the court determined St. Paul's policy was primary over Frontier's policy only to the extent damage was caused by Schuff's negligence.

In its trial brief, Frontier stated it could establish Schuff was primarily responsible for the accident because (1) it was required to maintain the crane during the lease period, but did not heed warnings the service brake was in disrepair; (2) it cut the crane's warning horn; (3) it did not hire an operator experienced with the type of crane leased; (4) the operator "lowered loads exceeding 20 tons with the controlled load lowering clutch in 'power down'

mode with the modulated clutch engaged," an "improper manner of lowering loads of that weight, because the crane tends to drive the loads to the ground"; (5) the operator "placed the crane in 'power down' mode and then engaged the modulation clutch—driving the load toward the ground—while slowing the load with the service brake," an "improper procedure with a 20 ton load" because it "caused the clutch linings to wear and the clutch slipped"; and (6) there was no " 'phone man' " on duty to advise the operator whether the drop zone was clear of personnel.

At trial, the court noted it appeared there was "significant liability to Bigge and significant liability on Schuff." However, the court nonetheless conclusively presumed the settlement of the underlying litigation was limited to Bigge's liability, for its own negligence or strict products liability. The court found that because Schuff had been dismissed from the underlying litigation, "there was no liability of Schuff which could have been settled."

However, the court improperly ignored Bigge's joint and several liability for the underlying plaintiffs' economic damages attributable to Schuff's negligence. (See *Hernandez, supra,* 28 Cal.App.4th at pp. 1818, 1822.) Indeed, because Schuff was immune to suit by employees or their heirs, there was an increased likelihood that Bigge's settlement of the underlying litigation included sums attributable to Schuff's fault. We conclude the court erred by refusing to allocate fault between Schuff and Bigge for purposes of determining whether St. Paul's policy was primary to Frontier's policy to any extent.

In *Hernandez,* this court noted "application here of a proportional indemnity analysis" was "facilitated by the jury's express findings on the percentage of negligence attributable to each party." (*Hernandez, supra,* 28 Cal.App.4th at p. 1822.) St. Paul contends that since here the underlying settlement was unallocated, fault cannot later be apportioned among insurers. St. Paul cites *Fire Ins. Exchange v. American States Ins. Co.* (1995) 39 Cal.App.4th 653 [46 Cal.Rptr.2d 135], in which the court explained that in a contribution action between excess insurers that covered the same risk, the cost of settlement should be equally prorated between them, as opposed to assessing contribution based on the comparative negligence of the insureds. (*Id.* at pp. 656, 663.) The court explained, "American States has cited no California authority holding that equitable contribution requires a specific finding of each insured's comparative fault. Such a rule would hamper settlements and require the defendant to prove its own fault before the defendant's insurer could seek equitable contribution." (*Id.* at p. 663.)

Here, however, St. Paul's policy is primary to Frontier's policy to the extent the settlement included Bigge's payment, on a joint and several basis, of the plaintiffs' economic damages attributable to Schuff's fault. "Primary insurance ('the first layer') provides immediate coverage upon the 'occurrence' of a 'loss' or the 'happening' of an 'event' giving rise to liability[.]...

[¶] In the context of liability insurance, the insurer providing such coverage has the *primary* duty to defend and indemnify the insured [citation], unless otherwise excused or excluded by specific policy language." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 8:75, p. 8-32.) "Excess insurance ('the second layer') provides coverage after other identified insurance coverage is no longer on the risk." (*Id.* at ¶ 8:76, p. 8-32.)

"Equitable contribution ... applies to apportion costs among insurers that *share the same level of liability* on the same risk as to the same insured." (*Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1089 [97 Cal.Rptr.2d 374], italics added.) "Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293 [77 Cal.Rptr.2d 296].) With regard to claims against Bigge attributable to Schuff's fault, the St. Paul and Frontier policies do not share the same level of liability, and principles of equitable subrogation apply. "One insurer has no right of contribution from another insurer with respect to its payment on an obligation for which it was *primarily* responsible, and as to which the liability of the second insurer was only *secondary.*" (*Id.* at p. 1298.) In contrast to equitable contribution, the "aim of equitable subrogation is to place the burden for a loss on the party ultimately liable or responsible for it and by whom it should have been discharged, and to relieve entirely the insurer or surety who indemnified the loss and who in equity was *not* primarily liable therefor." (*Id.* at p. 1296.)

█ In determining the equities among insurers, no specific rules govern. (*Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.* (1997) 52 Cal.App.4th 553, 559 [60 Cal.Rptr.2d 591]; *Fire Ins. Exchange v. American States Ins. Co., supra,* 39 Cal.App.4th at p. 664.) Rather, the court " 'should consider the nature of the claim, the relation of the insured to the insurers, the particulars of each policy and any other equitable considerations.' " (*Fire Ins. Exchange v. American States Ins. Co., supra,* at p. 664.) We conclude equity requires an allocation of fault between Schuff and Bigge, because that is the only means of determining whether, and to what extent, St. Paul's policy is primary to Frontier's policy.

St. Paul complains that a trial to allocate fault in this action would discourage settlements and "could not adequately replicate a trial that never took place in the underlying action." █ However, in indemnity actions, settling parties are commonly allowed to present expert testimony or other

probative evidence of nonsettling indemnitors' liability for the plaintiffs' damages (see, e.g., *Heppler, supra,* 73 Cal.App.4th at p. 1284; *Collins Development Co. v. D. J. Plastering, Inc.* (2000) 81 Cal.App.4th 771, 777 [97 Cal.Rptr.2d 83]). A similar procedure is appropriate here among the insurers.[11]

## IV, V*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## DISPOSITION

The November 30, 2000 judgment on St. Paul's complaint and Frontier's cross-complaint is reversed insofar as it concerns the court's (1) finding the St. Paul policy covers Bigge for its own negligence and strict products liability, and (2) presumption the settlement of the underlying litigation was exclusively for claims arising from Bigge's own negligence or strict products liability. The matter is remanded for a trial on the allocation of fault between Schuff and Bigge and the court's reconsideration of equitable apportionment among the insurers. In all other respects that judgment is affirmed.

The January 18, 2001 judgment on Frontier and Bigge's cross-complaint is affirmed. Schuff is awarded costs on appeal from Frontier and Bigge. In other respects, the parties are to bear their own costs on appeal.

Benke, Acting P. J., and Aaron, J., concurred.

A petition for a rehearing was denied August 28, 2003, and the opinion was modified to read as printed above. The petition of appellant American International Specialty Lines Insurance Company for review by the Supreme Court was denied December 17, 2003.

---

[11] St. Paul contends a trial for allocation of fault between Schuff and Bigge is unnecessary because under any circumstance, Frontier would be required to pay its $1 million policy limit and "anything less than about 68 percent liability allocation to Schuff would produce the same $730,000 excess portion to be split between St. Paul and AISLIC, after Frontier and St. Paul have exhausted their primary limits." St. Paul relies on the trial court's comment that both Schuff and Bigge were negligent and any "breakdown ... is going to be somewhere in the 30 to 50 percent range." However, the court precluded the parties from presenting any evidence on the allocation issue, and we do not presume any particular result.

AISLIC contends the trial court erred by ruling it and St. Paul are co-excess insurers and each is responsible for one-half of the $730,000 in excess liability. AISLIC relies on an "other insurance" provision of its policy. We are not required to consider the provision, however, given that under our holding, AISLIC is the sole excess carrier for any settlement amount found attributable to Bigge's own negligence or strict products liability, and is not on the risk for any excess liability arising from Schuff's negligence.

* See footnote, *ante,* page 1234.