[No. B175025. Second Dist., Div. One. Oct. 31, 2005.]

KRISHNAN RAGHAVAN, Plaintiff and Appellant, v.
THE BOEING COMPANY et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.A.2, II.A.3, and II.C.

1122

COUNSEL

Wagner Lautsch, Megan L. Wagner and Donald P. Wagner for Plaintiff and Appellant.

Mitchell, Silberberg & Knupp, Lawrence A. Michaels and Brett Thomas for Defendants and Respondents.

OPINION

**MALLANO, Acting P. J.**—The summary judgment statute (Code Civ. Proc., § 437c) permits a trial court to summarily adjudicate "one or more causes of action." (*Id.*, subd. (f)(1).) At trial, a "cause of action" that has been summarily adjudicated shall be "deemed to be established," and the case "shall proceed as to the cause or causes of action . . . remaining." (*Id.*, subd. (n)(1).) A grant of summary adjudication as to one or more causes of action does not bar other causes of action as to which summary adjudication has been denied. (*Id.*, subd. (n)(2).) And no one may comment on the grant or denial of a summary adjudication motion to a jury. (*Id.*, subd. (n)(3).)

In this action, plaintiff sued his former employer, alleging causes of action for wrongful termination in violation of public policy, defamation, breach of

an implied contract, and breach of the covenant of good faith and fair dealing. The employer moved for summary adjudication as to each cause of action. The trial court granted the motion in part, leaving only the wrongful termination cause of action, which was tried to a jury. The trial court, relying on the "undisputed facts" that supported summary adjudication of the defamation cause of action, instructed the jury that certain "facts" were established for purposes of trial.

Plaintiff contends the trial court erred in that regard. We conclude that, because the summary judgment statute expressly limits the effect of summary adjudication on a remaining cause of action, the jury instruction was improper, and the summary adjudication of the defamation cause of action did not restrict the type of evidence plaintiff could introduce in support of the wrongful termination cause of action. Because the jury instruction was prejudicial, we reverse the judgment with respect to that cause of action.

## I

## BACKGROUND

For purposes of our review, we accept as true the following facts and reasonable inferences supported by plaintiff's evidence and defendants' undisputed evidence. (See *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178–179 [70 Cal.Rptr.2d 96]; *Lomes v. Hartford Financial Services Group, Inc.* (2001) 88 Cal.App.4th 127, 131 [105 Cal.Rptr.2d 471].)

On October 23, 1987, plaintiff Krishnan Raghavan applied for a job at Hughes Space and Communications Company (HSCC). Raghavan signed an employment application that contained a "Pre-Employment Statement," which read: ". . . If employed by the company, I understand that such employment is subject to . . . the policies and regulations of the company . . . . [¶] . . . [¶] I understand that if I am employed by the Company my employment will not be for any specified term and may be terminated by me or by the Company at any time for any reason." Immediately above the Pre-Employment Statement were the words, "(PLEASE READ CAREFULLY BEFORE SIGNING)." (All capitals in original.) Raghavan's signature appeared immediately below the statement.

Raghavan started working for HSCC in April 1988. On April 4, 1988, he signed a "Start Notice," which indicated, among other things, his hourly work week, shift, hire date, start date, benefit date, job classification, base rate, pay rate, supervisor, building, room, and site. The notice also stated: "No promises or commitments have been made to me concerning the length of my employment . . . ."

In October 2000, The Boeing Company (Boeing) bought all issued and outstanding capital stock of HSCC and changed HSCC's corporate name to Boeing Satellite Systems, Inc. (BSS). HSCC, under its new name, continued its daily operations, producing generally the same products with the same employees in generally the same location. Raghavan became an employee of BSS.

In late 2000 and early 2001, the "Boeing Commercial Aircraft Group" (BCAG) was working on a potential sale of aircraft to the Russian airline Aeroflot. As part of the sale, the Russians requested an "industrial offset"—if the Russians bought the aircraft, Boeing would agree to conduct other business with Russian industries. The effort to find this additional business was supervised by Don Zinn, the acting vice-president of business development for Boeing's "Space and Communications Group" (S&C).

Zinn was considering a possible satellite deal with the Russians. Raghavan had previous experience in marketing satellites to Russians and was chosen to work on the deal. In mid-April 2001, Zinn told Raghavan to stop all work on the industrial offsets. At his deposition, Raghavan was asked, "Isn't it a fact that at a later point in time, you were given unequivocal instructions by Seal Beach [(Zinn)] to discontinue any efforts to try and assist them in connection with any industrial offset?" Raghavan replied, "[A]t a later time, some time in mid-April, I was—I was—you see you are jumping—let me go back. [¶] . . . [¶] At the later stage, yes, I was told that S&C was not interested in the industrial offset." Raghavan was also asked, "Dr. Raghavan, do you recall a conversation between yourself and Mr. Zinn on the telephone during mid-April in which he quote, asked you 'to stop exploring the industrial offset possibility,' close quote." Raghavan answered, "Yes, sir, I do." As Zinn testified, "A decision was made to put it all on hold because the deal was falling apart."

Raghavan wrote a memo to himself, dated June 15, 2001, stating: "During mid-April, Don Zinn asked me to stop exploring the industrial offset possibility; accordingly, I stopped work on that & concentrated on the satellite sales, purely as a business case for BSS."

At some point in April 2001, Raghavan's own vice-president, Ronald Maehl, gave him permission to pursue the sale of satellites to the Russians. As Raghavan testified at his deposition: "They said don't worry about industrial offset, if BSS is interested in satellite sales and service business opportunities, transponder sales opportunities, please go ahead and do it, and then I talked to Ron Maehl. [¶] He said, yes. Don't worry about industrial offset, just concentrate on satellite sales and establishing a partnership to—for transponder—owning of transponders and frequencies and service opportunities and exactly that is what I followed."

Raghavan went to Russia in late April. This was his second trip. About a week before the trip, Zinn told Raghavan that there "may be some commercial offset of aircraft here" and gave Raghavan the names of some people to contact to determine whether that was true. But before Raghavan left, Zinn suggested that he not bring up the subject of industrial offsets with the Russians. As Raghavan testified, "Mr. Zinn came back some time later to tell me not to—even before I was going for a second trip to Russia, not to do any discussions with any of the Russian customers on the industrial offset, . . . and I just followed his advice."

Raghavan worked with Geoffrey Gibbs, a business development manager, who prepared a written proposal supporting Raghavan's satellite project. According to Maehl's deposition testimony and Raghavan's declaration, Maehl recommended that Raghavan explain the aircraft deal and the industrial offsets "as part of the history of the [satellite] project." Raghavan showed the written proposal to Maehl, who suggested that minor changes be made. Gibbs made the changes.

On May 29, 2001, Raghavan met with senior BSS executives and requested $250,000 to fund market research for a satellite sale to the Russians. His presentation was based on the written proposal. Page 2 of the proposal, entitled, "Background," contained a heading, "Boeing Very Interested in a Potential Sale of 40 Commercial Jets ($4 Billion) to Russia." Under that heading, the proposal stated that Russia "is insisting on about 120% 'industrial offset' as a condition for the contract" and that "Satellite investment opportunities, identified by BSS, could eliminate shortfall in the required offset amount." On page 4, under the heading, "Russia Satellites Marketing—Needs/Next Steps," the proposal contained a subheading, "Closure on Offset Criteria for Aircraft Contract." On page 5, under the heading, "Next Steps: The Parallel Paths," the proposal had two columns: one read, "Evaluation of Market Potential"; the other read, "Determination of Offset Criteria." The bottom of page 5 contained the notation: "Russian Ventures being evaluated both as stand-alone satellite sales and as tie-in to BCAG efforts. For both timing and strategic reasons, these efforts should proceed simultaneously." Page 6, entitled, "Timeline," stated in part that in June 2001, Boeing should "[c]onduct discussions with [the Russians] regarding offset criteria"; on July 9, 2001, the market research study should be delivered; in July 2001, discussions should be held with "BCAG regarding possible synergy opportunities given market data and offset criteria"; and on August 1, 2001, a decision should be made "whether to allocate initial campaign fund for coordinated BCAG/BSS Russian Campaign."

Randy Brinkley, BSS's president, entered the meeting after it had started. When he saw Raghavan's proposal, he got angry, stopped the presentation,

and told Raghavan to review the presentation material with Zinn and get Zinn's approval. Thereafter, Brinkley requested that an investigation be conducted to determine whether Raghavan had made any misrepresentations during the presentation.

Alan Roper, BSS's ethics officer, conducted the investigation. Ultimately, BSS issued a written reprimand on July 30, 2001, stating: "Recently a BSS Ethics investigation substantiated that you engaged in misrepresentative behavior towards a number of Senior Management personnel . . . . Such improper behavior involved your failure to fully disclose all relevant information to all pertinent parties as regards a late April 2001 trip to Russia. Also substantiated was the fact that you provided BSS Senior Management with false information (i.e., made misleading statements) during a Tuesday, 29 May 01 meeting . . . . [¶] Provision of false or misleading information is not acceptable conduct at our Company. Although it did not appear that your misrepresentation(s) were malicious, and could perhaps be attributed to an overzealous pursuit of business in Russia, for your misrepresentative behavior in this situation(s) you are being given this written reprimand."

Meanwhile, in early April 2001, Raghavan had received an e-mail from Dean Farmer, BSS's director of new business development. The e-mail included about 40 pages of what appeared to be proprietary information obtained from Lockheed Martin Corporation, Farmer's previous employer and one of BSS's competitors. Raghavan believed that Farmer's possession and use of the Lockheed information was unlawful and reported the matter to BSS's ethics office. An investigation followed. Farmer was first interviewed on April 12, 2001, and again on May 2, 2001. The day after the first interview, Farmer was placed on a paid administrative leave, pending the completion of the investigation.

Farmer told investigators he brought the Lockheed documents to BSS solely for use in formatting presentations but admitted that the information could be used by a Lockheed competitor to gain insight into Lockheed's marketing strategies and practices. By letter to Farmer dated May 21, 2000, BSS stated: ". . . As a result of an investigation by the Ethics Office, BSS has concluded that the materials located on your office PC are inappropriate and likely constitute proprietary information belonging to Lockheed Martin. By having proprietary data of another company, you have violated Boeing and BSS ethical business standards, policies, and procedures, as well as company rules and regulations. . . . Your acts and omissions have led BSS to the difficult decision to terminate your employment effective immediately. . . ." Boeing returned the materials to Lockheed.

In July 2001, BSS implemented a company-wide reduction in force, resulting in the layoff of nearly 200 employees. Raghavan's immediate

supervisor, Lynne Wainfan, was told to choose at least one employee out of the eight in her group to be laid off. Wainfan, in consultation with Maehl, chose Raghavan.

On January 29, 2002, Raghavan filed this action against Boeing, BSS, Brinkley, and Roper (collectively defendants), alleging causes of action for wrongful termination in violation of public policy, defamation, breach of an implied contract, and breach of the covenant of good faith and fair dealing. A first amended complaint (hereafter complaint) was later filed.

In the wrongful termination cause of action, Raghavan alleged that Boeing and BSS (collectively BSS) had retaliated against him because he had engaged in whistleblowing by reporting Farmer's misconduct to the ethics office. The complaint further alleged that the retaliatory acts consisted of the written reprimand and his selection for layoff.

The defamation cause of action was based on the written reprimand. Raghavan alleged that: (1) defendants had falsely accused him in writing of an ethics violation, dishonest conduct, a lack of integrity, and incompetence; (2) the reprimand was made with malice; (3) when the reprimand was issued, defendants could reasonably foresee that it would be used in evaluating Raghavan for layoff; and (4) the reprimand negatively affected Raghavan's ability to retain his job.

The implied contract and covenant causes of action alleged that BSS had violated implied contractual terms by subjecting him to an unfounded ethics charge and by selecting him for layoff.

Before trial, defendants moved for summary judgment or, in the alternative, summary adjudication as to each cause of action. Raghavan filed opposition papers. The trial court denied summary judgment but granted summary adjudication as to all but the wrongful termination cause of action, stating in its order: (1) a triable issue of fact existed as to whether one or more decision makers had a retaliatory motive in taking actions against Raghavan; (2) the defamation cause of action failed because the allegations in the written reprimand were true; and (3) the implied contract and covenant causes of action lacked merit because Raghavan was an at-will employee. As to the defamation cause of action in particular, the trial court cited five of the "undisputed facts" in defendants' separate statement (see Code Civ. Proc., § 437c, subd. (b)(1)) in concluding that "the purported defamatory statements in the written reprimand . . . are true." (All further statutory references are to the Code of Civil Procedure unless otherwise indicated.)

The wrongful termination cause of action was set for jury trial. BSS filed an in limine motion, requesting that the trial court preclude Raghavan from

offering testimony that the accusations in the written reprimand were false. As BSS put it, "Raghavan should be prohibited from providing testimony that contradicts this Court's express findings" in granting summary adjudication. To do otherwise, BSS argued, the trial court "would be allowing Raghavan to relitigate issues which have already been fully litigated through Defendants' summary adjudication motion . . . ." BSS's counsel acknowledged that "[t]he written reprimand is going to be very central in the case."

Raghavan opposed the motion on the ground that the summary judgment statute prohibited an order excluding such evidence. In addition, Raghavan stated he intended to prove that he had not made any misrepresentations or provided misleading information at the May 29, 2001 meeting and that the reprimand was motivated by retaliatory animus. Raghavan also emphasized that the dispute over the truthfulness of the written reprimand "goes to the heart of the retaliation case."

The trial court stated that, in summarily adjudicating the defamation cause of action, "[t]he court found that the affirmative defense [of truth] was established without the existence of a single triable issue . . . . [¶] I think we need to bear that in mind. We cannot revisit the question whether the allegedly defamatory statements were true or untrue. . . . [¶] . . . [¶] . . . I think [Raghavan's] argument goes too far and too much. It nullifies the effect which [the summary judgment statute] gives to a grant of summary adjudication."

The trial court ruled that, based on the undisputed facts that supported the summary adjudication of the defamation cause of action, it would instruct the jury that certain facts were established, namely, Raghavan had made misrepresentations and provided misleading information at the May 29, 2001 meeting.

Thereafter, the parties jointly prepared a jury instruction along the lines described by the trial court. Although Raghavan stipulated to the language of the instruction, he "expressly reserve[d] his objection that it is improper for the Court to provide any instruction to the jury as a result of its granting summary adjudication to Defendants."

During opening statements, defense counsel discussed Raghavan's May 29, 2001 presentation, the investigation into whether Raghavan had made misrepresentations and provided misleading information, and the substance of the written reprimand. Defense counsel then stated: "Now, that written reprimand for making misrepresentations the court will tell you has been established to be true. Dr. Raghavan did misrepresent the facts in that reprimand."

Before the taking of evidence, the trial court instructed the jury as follows: "Raghavan received a written reprimand on July 30, 2001. It has been

established that the statements in the written reprimand that Raghavan engaged in misrepresentative behavior and made misleading statements are true. In particular, it has been established that Raghavan's written presentation at a May 29, 2001 meeting with Boeing Satellite Systems's senior management contained untrue statements regarding the status of certain industrial offsets."

In his closing argument, defense counsel stated: "I would like you to keep in mind as Judge Buckner read to you at the start of the case, there's a stipulated fact here that you must accept as true. And I would like to remind you what it is before we get into the [May 29, 2001] meeting, and that is we already know what happened at the . . . meeting because this is an established fact which you are required to accept as true in this case. [¶] That Dr. Raghavan received the written reprimand, that it has been established that the statements that he engaged in misrepresentative behavior and misleading statements are true and that his statements, Dr. Raghavan's statements in the . . . presentation, were untrue regarding the status of the industrial offsets."

The jury returned a verdict in favor of BSS. Judgment was duly entered. Raghavan appealed.

## II

## DISCUSSION

Raghavan challenges the summary adjudication order on the merits. He also contends the trial court erred by instructing the jury that the accusations in the written reprimand were true. Finally, he argues the trial court committed procedural errors in hearing the summary adjudication motion.

In the published portion of this opinion, we address Raghavan's contentions that the trial court improperly granted summary adjudication on the defamation cause of action and that the jury should not have been instructed that the accusations in the reprimand were true. Raghavan's remaining contentions are discussed in the nonpublished portion of the opinion.

### A. *Summary Adjudication*

■ A motion for summary judgment must be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (§ 437c, subd. (c).)

■ " 'A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . ■ In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . [T]he moving party's affidavits are strictly construed while those of the opposing party are liberally construed.' . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence." (*Jackson v. County of Los Angeles, supra,* 60 Cal.App.4th at pp. 178–179, citations omitted.)

■ "[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . .

"[H]ow the parties moving for, and opposing, summary judgment may each carry their burden of . . . production depends on *which* would bear *what* burden of proof at trial." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851 [107 Cal.Rptr.2d 841, 24 P.3d 493], italics in original.) The same principles apply to motions for summary adjudication. (See *Lomes v. Hartford Financial Services Group, Inc., supra,* 88 Cal.App.4th at p. 131.)

### 1. *Defamation*

■ "Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage. . . . Publication means communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made. Publication need not be to the 'public' at large; communication to a single individual is sufficient." (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645 [85 Cal.Rptr.2d 397], citations & fn. omitted.)

■ "In all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose." (*Smith v. Maldonado, supra,* 72 Cal.App.4th at p. 646.) "[T]he defendant need not justify the literal truth of *every word* of the allegedly defamatory matter. It is

sufficient if the *substance* of the charge is proven true, irrespective of slight inaccuracy in the details, 'so long as the imputation is substantially true so as to justify the *"gist or sting"* of the remark.' " (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1180–1181 [96 Cal.Rptr.2d 136], first italics in original, second italics added.)

■ Raghavan's defamation cause of action is based solely on the written reprimand, which accused Raghavan of "engag[ing] in misrepresentative behavior towards a number of Senior Management personnel." "Misrepresent" means "to give a false, imperfect, or misleading representation." (Webster's 3d New Internat. Dict. (1981) p. 1445, col. 1.)

The reprimand consisted of two specific charges: (1) Raghavan failed to disclose all relevant information concerning his April 2001 trip to Russia; and (2) he provided false, or misleading, information during his May 29, 2001 presentation to BSS executives. In their respondents' brief, defendants focus on the charge that Raghavan provided false, or misleading, information at the May 29, 2001 meeting.

In connection with the presentation of Raghavan's satellite project, Maehl had instructed Raghavan to explain the aircraft deal and industrial offsets as part of the *history* of the project. As Raghavan already knew, BCAG's aircraft negotiations and the offsets were on hold. In mid-April 2001, Zinn told Raghavan to stop all work on the offsets. Raghavan so testified at his deposition. Raghavan also acknowledged Zinn's instruction in a June 14, 2001 memo to himself, stating: "During *mid-April*, Don Zinn asked me to stop exploring the industrial offset possibility; accordingly, *I stopped work on that & concentrated on the satellite sales, purely as a business case for BSS.*" (Italics added.)

Yet, Raghavan's *May 29, 2001* written proposal discussed the aircraft deal and the offsets as if they were still under active consideration, as follows: "Boeing Very Interested in a Potential Sale of 40 Commercial Jets ($4 Billion) to Russia," and Russia "is insisting on about 120% 'industrial offset' . . . ." The proposal stated that Raghavan's satellite project "could eliminate shortfall in the required offset amount," and there should be a "Closure on Offset Criteria for [the] Aircraft Contract" as well as a "Determination of Offset Criteria." The proposal also stated, "Russian Ventures being evaluated both as stand-alone satellite sales and as [a] tie-in to BCAG efforts [to sell aircraft]." Finally, the proposal recommended that in June 2001 (the month following the presentation), Boeing discuss offset criteria with the Russians; in July 2001, discussions should be held with "BCAG regarding synergy opportunities given market data and offset criteria"; and on August 1, 2001, a decision should be made "whether to allocate initial campaign funds for coordinated BCAG/BSS Russian Campaign."

Thus, Raghavan's presentation went far beyond discussing the offsets as part of the *history* of the satellite project. Instead, Raghavan emphasized the importance of his satellite project in obtaining offsets on the aircraft deal—a deal that was, in Zinn's words, "falling apart." And Raghavan's proposal repeatedly described the offsets as an important part of both projects—his (BSS's) satellite project and BCAG's aircraft deal. In short, Raghavan's proposal did not contain even a hint that the aircraft sale and the offsets were on hold. By pitching his project in such a way, Raghavan provided false, or misleading, information to BSS executives.

Thus, the gist or sting of the reprimand—that Raghavan engaged in misrepresentative behavior toward a number of senior management personnel—was true. Raghavan's defamation cause of action was therefore without merit as a matter of law.

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Jury Instruction*

 Under the summary judgment statute (§ 437c), a trial court may not instruct the jury as to any "factual issue" because, in ruling on a motion, the trial court does not adjudicate such "issues." Rather, as in this case, the trial court may decide that a cause of action should be summarily adjudicated because there are no disputed facts and it lacks merit as a matter of law. At the trial on a remaining cause of action, the statute precludes the trial court from commenting upon the grant of summary adjudication, for example, by instructing the jury that certain "facts" are established.

In an in limine motion, BSS argued that the "undisputed facts" it presented in seeking summary adjudication on the defamation cause of action supported the conclusion that the accusation in the written reprimand was true and that, at trial, Raghavan should not be allowed to introduce evidence to the contrary or "relitigate" that issue before the jury. The trial court agreed and instructed the jury that the accusations were true, relying on the summary judgment statute as the basis for its ruling. As we read that statute, it precluded the jury instruction and did not restrict the type of evidence Raghavan could introduce at trial.

 " 'The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of

---

*See footnote, *ante*, page 1120.

the law. . . .' . . . In determining that intent, we first examine the words of the statute itself. . . . Under the so-called 'plain meaning' rule, courts seek to give the words employed by the Legislature their usual and ordinary meaning. . . . If the language of the statute is clear and unambiguous, there is no need for construction. . . . ' "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." . . .' " (*Bodell Construction Co. v. Trustees of Cal. State University* (1998) 62 Cal.App.4th 1508, 1515–1516 [73 Cal.Rptr.2d 450], citations omitted.)

As of 1989, the summary judgment statute permitted the summary adjudication of virtually any "issue" in a case, stating: "If it appears that the proof supports the granting of the motion for summary adjudication as to some but not all the *issues* involved in the action, or that one or more of the *issues* raised by a claim is admitted, or that one or more of the *issues* raised by a defense is conceded, the court shall, by order, specify that those *issues* are without substantial controversy. . . . At the trial of the action the *issue* so specified shall be deemed established and the action shall proceed as to the *issues* remaining." (Stats. 1989, ch. 1416, § 16, pp. 6229–6230, italics added; see Historical and Statutory Notes, 14C West's Ann. Code Civ. Proc. (2004 ed.) foll. § 437c, pp. 280–281.)

 In 1990, the statute was amended to limit—and still limits—summary adjudication motions to the disposition of one or more causes of action, affirmative defenses, claims for damages, or issues of duty. (See Stats. 1990, ch. 1561, § 2, p. 7331; § 437c, subd. (f)(1); *DeCastro West Chodorow & Burns, Inc. v. Superior Court* (1996) 47 Cal.App.4th 410, 418–421 [54 Cal.Rptr.2d 792].) The purpose of this amendment, as stated by the Legislature, was "to stop the practice of adjudication of *facts* or adjudication of *issues* that do not completely dispose of a cause of action or a defense." (Stats. 1990, ch. 1561, § 1, p. 7330, italics added.)

Two years later, the statute was amended to provide: "If a motion for summary adjudication is granted, at the trial of the action, the cause or causes of action within the action, affirmative defense or defenses, claim for damages, or issue or issues of duty as to the motion which has been granted shall be deemed to be established and *the action shall proceed as to the cause or causes of action*, affirmative defense or defenses, claim for damages, or issue or issues of duty *remaining*." (Stats. 1992, ch. 1348, § 1, p. 6702, italics added.) This provision has remained intact. (See § 437c, subd. (n)(1).)

An amendment in 1993 added: "In the trial of the action, the fact that a motion for summary adjudication is granted as to one or more causes of

action, affirmative defenses, claims for damages, or issues of duty within the action *shall not operate to bar any cause of action*, affirmative defense, claim for damages, or issue of duty as to which summary adjudication was either not sought or denied." (Stats. 1993, ch. 276, § 1, p. 1973, italics added.) The statute has retained this provision. (See § 437c, subd. (n)(2).)

And in 1994, a new provision stated: "In the trial of an action, neither a party, nor a witness, nor the court shall *comment* upon the grant or denial of a motion for summary adjudication to a jury." (Stats. 1994, ch. 493, § 1, p. 2676, italics added; see also Stats. 1993, ch. 276, § 1, p. 1973.) This language has not been further amended. (See § 437c, subd. (n)(3).)

 Thus, beginning in 1990, the Legislature narrowed the scope of the summary judgment statute and limited the effect of summary adjudication on the remaining causes of action. The most significant change was enacted in 1990, when the Legislature prohibited the summary adjudication of general "issues" and required instead that a summary adjudication motion dispose of one or more causes of action, affirmative defenses, claims for damages, or issues of duty. As a result of the 1990 amendment, "facts" of any kind— undisputed, underlying, supporting, or subsidiary—were no longer subject to summary adjudication. (See *Catalano v. Superior Court* (2000) 82 Cal.App.4th 91, 96–97 [97 Cal.Rptr.2d 842].) "[T]he trial court's role in deciding a motion for summary [adjudication] involves no findings of fact." (*Soto v. State of California* (1997) 56 Cal.App.4th 196, 199 [65 Cal.Rptr.2d 11].)

 In 1992, the Legislature made clear that a *grant* of summary adjudication as to a particular cause of action is *deemed established at trial*, but the case "proceed[s] as to the . . . causes of action . . . remaining." (Stats. 1992, ch. 1348, § 1, p. 6699.) As applied here, the grant of summary adjudication on the defamation cause of action was deemed established at trial, that is, the cause of action would not be tried. Defendants had prevailed on that cause of action. But nothing else was deemed established. The wrongful termination cause of action should have proceeded unaffected.

 To further limit the effect of a grant of summary adjudication, the 1993 amendment provided that a summarily adjudicated cause of action shall not "bar" any of the remaining causes of action. This language is reminiscent of the doctrines of res judicata and collateral estoppel. " '[R]es judicata gives certain conclusive effect to a former judgment in subsequent litigation involving the same controversy. . . .' Under the collateral estoppel aspect of res judicata, relitigation of an issue previously adjudicated is generally precluded if certain criteria are met." (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1247 [29 Cal.Rptr.3d 521], italics omitted.)

As stated, BSS argued in its in limine motion that Raghavan should not be allowed "to relitigate issues which have already been fully litigated through Defendants' summary adjudication motion." But the amendments we have been discussing—mandating that summary adjudication motions dispose of "a cause or causes of action" instead of "issues," requiring that the grant of summary adjudication be deemed established at trial and that the remaining causes of action proceed unaffected, and stating that a summarily adjudicated cause of action shall not bar a remaining cause of action—express a unifying theme that summary adjudication shall have no preclusive effect during the subsequent trial. Yet, here, the trial court instructed the jury that the summary adjudication of the defamation cause of action established certain facts as to the wrongful termination cause of action.[1]

In addition, the 1994 amendment prohibited the trial court, parties, and witnesses from making "comments" to the jury about the grant or denial of summary adjudication. In this case, the trial court believed it could instruct the jury about the supposed effect of the summary adjudication of the defamation cause of action as long as it did not use the words "summary adjudication," mention the statute (§ 437c), or refer to the motion for summary adjudication. We disagree. The trial court's approach exalted form over substance. (See Civ. Code, § 3528.) The 1994 amendment, like its predecessors, furthered the Legislature's goal that the summary adjudication of a cause of action would not affect the trial of a remaining cause of action.

We read the legislation's history to mean that the summary adjudication of "a cause of action" removes from the case "a separate theory of liability" (*Catalano v. Superior Court, supra*, 82 Cal.App.4th at p. 96, italics omitted) but has no bearing on how "the remaining causes of action"—the other theories of liability—are to be tried or proved. In short, the succession of amendments from 1990 to 1994 was intended "to stop the practice of piecemeal adjudication of facts that did not completely dispose of a substantive area." (*Id.* at p. 97.) At the same time, each cause of action, or substantive area, that is not summarily adjudicated is to stand on its own at trial.

BSS's authorities do not suggest to the contrary. For instance, in *Conway v. Bughouse, Inc.* (1980) 105 Cal.App.3d 194 [164 Cal.Rptr. 585], the court discussed summary adjudication as permitted *before* the series of amendments beginning in 1990. (See *id.* at p. 202, quoting § 437c; see, e.g., Stats.

---

[1] Neither res judicata nor collateral estoppel would actually apply here because, among other reasons, the order granting summary adjudication was not "final" as to BSS. (See *Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 394 [134 Cal.Rptr.2d 689]; *Lomeli v. Department of Corrections* (2003) 108 Cal.App.4th 788, 797–798 [134 Cal.Rptr.2d 179]; *Jacobs-Zorne v. Superior Court* (1996) 46 Cal.App.4th 1064, 1070–1071 [54 Cal.Rptr.2d 385].)

1980, ch. 57, § 1, p. 152; Stats. 1978, ch. 949, § 2, p. 2931; Stats. 1976, ch. 675, § 1, pp. 1664–1665; Stats. 1973, ch. 366, § 2, p. 808.)

And in *St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.* (2003) 111 Cal.App.4th 1234 [4 Cal.Rptr.3d 416], the court made the unremarkable observation: "Ordinarily, parties may not relitigate issues summarily adjudicated. . . . 'If a motion for summary adjudication is granted, *at the trial of the action*, the *cause or causes of action* within the action, affirmative defense or defenses, claim for damages, or issue or issues of duty as to the motion which has been granted *shall be deemed to be established* and the *action shall proceed as to the cause or causes of action*, affirmative defense or defenses, claim for damages, or issue or issues of duty *remaining*.' . . . '[T]he policy behind summary adjudication motions [is] "to 'promote and protect the administration of justice, and to expedite litigation by the elimination of needless trials.' " ' " (*Id.* at p. 1249, citations omitted, some italics added.)

 Finally, the jury instruction in this case was prejudicial. "A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. . . . [¶] Thus, when the jury receives an improper instruction in a civil case, prejudice will generally be found only ' "[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction . . . ." ' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298], citations omitted.)

Here, before the taking of evidence, the trial court instructed the jury that Raghavan had engaged in misrepresentative behavior and provided misleading information to his superiors. Defense counsel emphasized that point in his opening statement and closing argument. In essence, the trial court told the jury at the outset that Raghavan was not a credible witness. Because his wrongful termination cause of action rested in large part on his own testimony, the damage to his credibility and his case cannot be overstated.

Equally important, the jury instruction involved the truthfulness of the accusations in the written reprimand. Defendants characterized the reprimand as "central" to the case, and Raghavan described it as the "heart" of his wrongful termination cause of action. Raghavan was prepared to testify that, in retaliation for his whistleblowing activity, which resulted in the discharge of a valued employee, BSS trumped up the accusations in the reprimand and set him up for layoff. Because the jury was instructed that the accusations

were true, the jury was more likely to find that BSS issued the reprimand for legitimate disciplinary reasons. (See *Gibbs v. Consolidated Services* (2003) 111 Cal.App.4th 794, 796–801 [4 Cal.Rptr.3d 187].)

We therefore conclude that the judgment must be reversed as to the wrongful termination cause of action.[2]

C. *Procedural Errors in Hearing the Motion**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# III

# DISPOSITION

The order granting summary adjudication is affirmed. The judgment is reversed with respect to (1) plaintiff's cause of action for wrongful termination in violation of public policy against defendant Boeing Satellite Systems, Inc., and (2) any award of costs to that defendant, and that cause of action is remanded for a new trial. In all other respects, the judgment is affirmed. The parties are to bear their own costs on appeal.

Rothschild, J., concurred.

**VOGEL, J.,** Concurring.—I concur, but write separately to emphasize three points.

First, summary adjudication of a cause of action must be (a) denied where the material facts are disputed, and (b) granted only when the undisputed facts establish the moving party's right to prevail as a matter of law. (Code Civ. Proc., § 437c, subds. (c), (f)(1).) In either event, no facts are adjudicated (*Soto v. State of California* (1997) 56 Cal.App.4th 196, 199 [65 Cal.Rptr.2d 11]), which means an order granting summary adjudication could not support a statement by anyone that any facts had been decided or "established."

Second, section 437c expressly prohibits any comment by anybody (the trial court, the parties or a witness) about an order granting or denying a motion for summary adjudication. (Code Civ. Proc., § 437c, subd. (n)(3).)

---

[2] In the special verdict, the jury found that Raghavan was not employed by The Boeing Company. Raghavan has not challenged that finding on appeal. Accordingly, the wrongful termination cause of action may not go forward as to that defendant. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317] [issued not raised on appeal is waived]; *Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 237–238 [118 Cal.Rptr.2d 313] [same].)

* See footnote, *ante*, page 1120.

Third, the trial court's comments in this case (which were tantamount to a directed verdict) prove the wisdom of the legislative amendments making it clear that, when some but not all causes of action are disposed of by summary adjudication, the remaining causes of action are to proceed to trial on their own merits, unfettered by references to whatever orders the court may have made about other causes of action. (Code Civ. Proc. § 437c, subd. (n)(1), (n)(3).) For all we know, Raghavan might have had tactical reasons for putting on less than a full court press when opposing BSS's motion for summary adjudication of the defamation cause of action, something he was plainly entitled to do without risk of the penalty imposed at trial.

Respondents' petition for review by the Supreme Court was denied January 18, 2006, S139616. Baxter, J., and Chin, J., did not participate therein.