Filed 2/2/15  Contiki U.S. Holdings v. DiLanzo CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CONTIKI U.S. HOLDINGS, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ANGELA DɪLANZO, <br><br> Defendant and Appellant. | B247620 <br><br> (Los Angeles County <br> Super. Ct. No. SC118342) |

APPEAL from an order of the Superior Court of California, County of Los Angeles.  Bobbi Tillmon, Judge.  Affirmed.

Alireza Alivandivafa and Kavita Tekchandani for Defendant and Appellant.

Lewitt, Hackman, Shapiro, Marshall & Harlan, Sue M. Bendavid and Nicholas Kanter for Plaintiff and Respondent.

_____

When Contiki U.S. Holdings, Inc., a tour company, sued Angela DiLanzo, a former tour guide, for defamation, DiLanzo filed a special motion to strike pursuant to Code of Civil Procedure section 425.16 (the anti-SLAPP statute).[1] The trial court denied the motion.

We conclude that even if DiLanzo made the required showing on the first prong of the test for a special motion to strike: that portions of this action arise from protected activity within the meaning of the anti-SLAPP statute, the trial court correctly concluded that Contiki demonstrated its lawsuit has at least the minimal merit required to possess a probability of prevailing. Accordingly, we affirm.

## BACKGROUND

1.     DiLanzo's Employment with Contiki

Contiki offers pre-packaged tours that include travel, flights, meals and lodging and are led by tour managers. DiLanzo worked for Contiki as a tour manager in 2007 and 2008. On August 28, 2007, DiLanzo joined a "Wild West" tour led by Jordan A., another Contiki tour manager. On August 31, September 1 and September 17, 2007, the two engaged in sex.

A year later, on October 25, 2008, DiLanzo told Contiki in an email that "co-workers" had pinned her "to the wall and tr[ied[] to pull [her] clothes off."

The next day, on October 26, 2008, DiLanzo resigned her employment by way of an email to Contiki in which she stated managing tours for the company had been "an incredible experience." She stated she "appreciate[d] the innumerable opportunities . . . to meet some really wonderful people both in co-workers and clients" and "strongly believe[d] in the brand." She "truly love[d] Contiki" and was "happy about how [her] life has evolved and what has been accomplished."

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.'" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.) Further statutory references will be to the Code of Civil Procedure unless otherwise noted.

However, on December 7, 2008, DiLanzo sent an email to Jacqui Chaffins, a Contiki Human Resources Manager, stating a "male Tour Manager" had pinned her against a wall in a hotel and tried to pull her clothes off. When Chaffins called to investigate, DiLanzo reported that on two successive mornings Jordan A. had tried to pull her into the shower with him, but she refused to go. Chaffins advised DiLanzo that Contiki would investigate, but if she wanted to pursue a criminal action against Jordan A. she would have to contact the appropriate authorities to file an assault claim and/or seek a restraining order. DiLanzo said that would not be necessary, as she lived in Pennsylvania and had not seen or spoken to Jordan A. in a year.

On December 16, 2008, DiLanzo sent an email to Contiki's Human Resources Department describing the events of August and September 2007. In it, she said she became intoxicated on the evening of August 31 and invited Jordan A. to come onto a bed she was on. He did, and after approximately 90 seconds of petting he pulled off her shorts and they "had sex wasted." They had sex again the next morning and then spent the day shopping and eating. Two weeks later, on September 17, she told a coworker she intended "to stalk [Jordan A.] and make him have sex" with her again, this time "on [her] terms," i.e., when she was sober. She repeatedly invited Jordan A. to come to her hotel room, and once he did so they, in her words, "started 'soberly' hooking up."

Chaffins and other Contiki human resources personnel interviewed Jordan A. He stated he and DiLanzo had consensual sex in August and September 2007. He expressed embarrassment about it and promised it would not happen again. Contiki also attempted to contact the tour bus driver from that tour, but she did not return phone calls. On February 20, 2009, Chaffins advised DiLanzo she had completed her investigation but concluded DiLanzo's claims could not be substantiated. She encouraged DiLanzo to contact the authorities and stated Contiki would cooperate with any investigation.

Neither Contiki nor Jordan A. were ever informed of any criminal investigation into the matter.

3

Nearly three years later, on November 1, 2011, DiLanzo posted on an online forum called www.thingsboganslike.com that Contiki "had issues with their tour guides raping and assaulting people, and have just attempted to covering [*sic*] it up."

On March 23, 2012, DiLanzo stated in an email to the author of a blog that "Contiki knowledgably [*sic*] employs violent rapists. While on Contiki, I was violently sexually assaulted and raped by a Tour Manager. . . . Contiki did not interview a single witness."

On May 1, 2012, DiLanzo posted on the Web site lonelyplanet.com that "Whilst other tour operators do background checks (financial, criminal, etc.) on their hires, Contiki does not. They have had issues with their tour guides raping and assaulting people, and have just attempted to covering [*sic*] it up"; "Do not expect Contiki to care whether or not it's [*sic*] violent employees cause harm or not."

Around July 2012, DiLanzo posted on an online forum on www.thenation.com, in response to a blog article entitled, "How to Out a Rapist," that "Contiki knows that they are harboring a rapist. Reports were made to HR, which were not investigated. . . . People who were witnesses even had emails forwarded to HR, but instead they chose not to investigate. . . ."

On July 28, 2012, DiLanzo stated in an email to the Operations Resource Manager of Contiki Holidays, United Kingdom that Contiki personnel "in management and HR . . . break so many petty laws, and instead of making the company safe, cover everything up so you wouldn't have a lawsuit"; "Contiki USA is OK WITH RAPE"; "Contiki left me with permanent brain damage. . . . You have management that ignores basic laws."

On September 6, 2012, DiLanzo stated in an email to a Contiki partner company that "No one is background checked and they don't fire anyone, no matter how egregious their behavior. I was one of at least four female co-workers who were violently and/or plied with alcohol. . . . Contiki actually threatened the victims, myself included, and chose to do nothing and cover this up."

On September 11, 2012, Contiki sued DiLanzo, asserting six causes of action for libel per se. Contiki alleged that on six occasions (one for each cause of action), DiLanzo

4

published statements to the effect that she suffered an acquaintance rape at the hands of another Contiki tour guide and that Contiki knows some of its guides are rapists but fails to perform background checks, investigate rape allegations, or take any other action to mitigate the danger to employees and clients.

DiLanzo answered the complaint and moved to have it stricken under section 425.16 as a SLAPP suit, arguing the lawsuit arose from protected activity within the meaning of the anti-SLAPP statute and Contiki could not demonstrate a probability of prevailing. Contiki opposed the motion, arguing its allegations did not arise from protected activity, as DiLanzo's communications were made privately to private third parties about nonpublic matters. Contiki further argued its evidence established DiLanzo had published unprivileged defamatory statements about it to third parties who would understand their referents, and the statements were false, as Contiki conducted background checks on its employees, did not employ rapists, and investigated DiLanzo's allegations, finding them to be unsubstantiated.

Following a hearing, the trial court denied DiLanzo's special motion to strike. In a well reasoned order, the court found the three statements made by DiLanzo by email and the one posted on lonelyplanet.com were not made in public forums, as email is a private forum and lonelyplanet.com was a restricted Web site. But the two communications posted on thenation.com and thingsboganslike.com were made in public forums because those Web sites are freely available to the public. The court found those latter two statements concerned a matter of public interest, but Contiki established a probability of prevailing on the merits by demonstrating it investigated DiLanzo's allegations. DiLanzo timely appealed.

**DISCUSSION**

**Standard of Review**

We review an order granting or denying a motion to strike under section 425.16 de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).) "We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither

5

'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.'" (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.)

Under section 425.16, a party may move to dismiss "certain unmeritorious claims that are brought to thwart constitutionally protected speech or petitioning activity." (*Robinzine v. Vicory* (2006) 143 Cal.App.4th 1416, 1420-1421.) Section 425.16 provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

In evaluating an anti-SLAPP motion, we conduct a two-step analysis. We first decide whether the defendant "has made a threshold showing that the challenged cause of action arises from protected activity." (*Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482, 488.) If the defendant makes this showing, we decide whether the plaintiff "has demonstrated a probability of prevailing on the claim." (*Id.* at p. 488.)

**DiLanzo's Statements Arguably Concerned a Matter of Public Interest**

Section 425.16, subdivision (e), sets forth four categories of conduct to which the anti-SLAPP statute applies. To make a sufficient threshold showing that the alleged activity is protected by the anti-SLAPP statute a defendant must demonstrate the conduct by which the plaintiff claims to have been injured falls within one of the four categories. (*Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 66.) The first two categories include statements made before, or in connection with an issue under consideration by, a legislative, executive, or judicial proceeding.

None of the subject publications was made in connection with any legislative, executive, or judicial proceeding. DiLanzo asserts several of them were made in response to Contiki sending her a "cease and desist" letter, and argues such a letter is a

6

communication connected with an official proceeding, which means her response would also be such a communication.  The argument is without merit.  A communication made in anticipation of litigation is entitled to the benefits of section 425.16.  (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.)  But DiLanzo does not argue, and no evidence suggests, that she made the statements about Contiki in anticipation of any litigation.

The third and fourth categories embrace statements made either "in a place open to the public or a public forum" or "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech," so long as the statements or conduct concern an issue of public interest.  (§ 425.16, subd. (e).)

Much of the trial court's order and the parties' briefing focus on which of DiLanzo's six statements were made in a public forum.  A public forum is a place open to general public "'for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  (*International Soc'y for Krishna Consciousness v. Lee* (1992) 505 U.S. 672, 679, quoting *Hague v. Committee for Industrial Organization* (1939) 307 U.S. 496, 515.)  For example, a Web site that is free and accessible to the public is a public forum for purposes of the anti-SLAPP statute.  (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4.)  A Web site where access is selective, on the other hand, is not a public forum.  (See *Arkansas Educ. TV Comm'n v. Forbes* (1998) 523 U.S. 666, 678-680 [media outlets providing only selective access are not public forums].)

The trial court found that the three statements made by email—to a Contiki partner company, to the Operations Resource Manager of Contiki Holidays, United Kingdom, and to the author of a blog—were not made in a public forum because those emails were not public.  Another statement, that Contiki did not conduct background checks and covered up employee rape, was made on the Web site "lonelyplanet.com."  The court found nothing in the record established the Web site is sufficiently open to general public

7

access as to be considered a public forum.[2]  As to the remaining two statements, the court found the first, that Contiki knowingly harbored a rapist and refused to investigate DiLanzo's report, was posted as a comment on a blog posting entitled, "How to Out a Rapist" on the Web site "thenation.com."  The second statement, that Contiki covered up rape committed by its tour guides, was posted on a blog at "thingsboganslike.com."  The trial court determined these statements, which are the subjects of Contiki's second and sixth causes of action, were made in public forums.[3]

We need not resolve whether DiLanzo's email and Internet postings were made in public forums because even private statements fall within the protection of section 425.16, so long as they concern a public issue.  (*Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1467.)  The real issue is whether the statements were made in connection with an issue of public interest.

Section 425.16 does not define "issue of public interest."  "[I]t is doubtful an all-encompassing definition could be provided.  However, the statute requires that there be some attributes of the issue which make it one of public, rather than merely private, interest.  A few guiding principles may be derived from decisional authorities.  First, 'public interest' does not equate with mere curiosity.  [Citations.]  Second, a matter of public interest should be something of concern to a substantial number of people.  [Citation.]  Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest.  [Citations.]  Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation].  Fourth, the focus of the speaker's conduct should be the public interest rather

---

[2]  On our own motion we will take judicial notice that lonelyplanet.com is not freely accessible, as it requires that one "join" the Web site and sign in before viewing what is posted there.  (http://www.lonelyplanet.com [as of Jan. 9, 2015].)

[3]  On our own motion we will take judicial notice that these Web sites are freely open to the public.  (http://www.thenation.com [as of Jan. 9, 2015]; http://thingsboganslike.com/2009/10/23/8-contiki-tours [as of Jan. 9, 2015].)

8

than a mere effort 'to gather ammunition for another round of [private] controversy . . . .'" (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132-1133.)

Public interest has been found where statements were made concerning a lawsuit against a large and wealthy church that had been the subject of extensive media coverage (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 651, disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc.*, *supra*, 29 Cal.4th at p. 68), concerning the placement of a battered women's shelter that had been the subject of considerable public controversy (*Averill v. Superior Court* (1996) 42 Cal.App.4th 1170, 1175), concerning allegations of domestic violence against a nationally known political consultant who successfully had used the domestic violence issue in a number of political campaigns (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 238-239), concerning political statements regarding self-government of 3,000 persons who lived in a gated community (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479), and concerning a participant in the television broadcast *Who Wants to Marry a Multimillionaire* that had generated considerable public debate. (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807-808.)

In contrast, no issue of public interest was involved where an employee union published allegations of misconduct by a supervisor toward eight employees. (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924.)

Nothing in the record suggests Contiki is so large, wealthy or well known, or generates so much public controversy or debate as to make its affairs a matter of public concern. But the activity alleged by DiLanzo—the harboring of an alleged sexual predator among a group of semi-captive potential victims—is arguably a matter of public concern. Contiki sends tour managers along with its clients on tours for which it arranges the travel, lodging and meals. Participants are almost by definition dependent upon and to an extent controlled by the tour managers, who may in large part determine where the tourists stay, where they eat, and how they travel, and will often stay with them while they do so. Because DiLanzo's statements focused on the concern about possible sexual

9

abuse by such a tour manager, we will grant for the purpose of argument that her publications concerned a matter of public interest.

**Contiki Demonstrated a Probability of Prevailing on its Claims**

But even if Contiki's allegations arose from protected activity, Contiki demonstrated a probability of prevailing on its claims. Contiki's burden was to demonstrate that its complaint was "'both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" (*Soukup*, *supra*, 39 Cal.4th at p. 291.) The trial court must deny an anti-SLAPP motion if "'"the plaintiff presents evidence establishing a prima facie case which, if believed by the trier of fact, will result in a judgment for the plaintiff."'" (*Robinzine v. Vicory*, *supra*, 143 Cal.App.4th at p. 1421.) At this stage of the proceedings, the plaintiff "need only establish that his or her claim has 'minimal merit' [citation] . . . ." (*Soukup*, *supra*, 39 Cal.4th at p. 291.) Although "'the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'" (*Ibid.*)

"Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) To establish a cause of action for libel per se, a plaintiff must demonstrate the defendant made a statement about the defendant that was defamatory without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact. (Civ. Code, § 45a.) "'Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage. . . . Publication means communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made. Publication need not be to the "public" at large;

10

communication to a single individual is sufficient.'" (*Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1132.)

DiLanzo stated, in effect, that Contiki failed to conduct background checks on employees, refused to take action against employees it knew were rapists, condoned rape and threatened rape victims. It is undisputed DiLanzo communicated these statements under such circumstances that the recipients would understand their defamatory meaning and application to Contiki. But Contiki easily demonstrated its causes of action for libel were supported by sufficient facts to sustain a judgment in its favor.

Andrea Mullens, Vice President of Human Resources for TravCorp, which provides human resources services for Contiki, declared Contiki would not hire or retain a known rapist and had never received a complaint, other than DiLanzo's, accusing any employee of rape. Contiki's policies prohibit harassment of any kind and encourage employees to report any incident of harassment. Mullens declared she personally investigated DiLanzo's allegations and concluded they could not be substantiated. Jacqui Chaffins, TravCorp's Human Resources Manager, declared Contiki does, in fact, conduct background checks on its tour managers. And she, along with Claudia Brooks, Contiki's Operations Manager, investigated DiLanzo's allegations but could not substantiate them. She advised DiLanzo to seek appropriate criminal remedies.

If credited by the jury, Contiki's evidence demonstrates DiLanzo's allegations are false and would permit a jury to reach a verdict in Contiki's favor.

DiLanzo attempts to rebut this showing by characterizing Contiki's evidence as "unreliable" and criticizing the tour company's response to her complaints. DiLanzo adduces several actions Contiki should have taken but did not. For example, it failed to interview two persons to whom DiLanzo also complained about Jordan A. and failed to terminate Jordan A.'s employment. Contiki also took no satisfactory action when she claimed another Contiki employee made gender based derogatory remarks to her. These points are irrelevant. The reliability of Contiki's evidence and the adequacy of its response to DiLanzo's allegations are matters for the jury. On a special motion to strike,

11

Contiki need only make a prima facie case that DiLanzo's assertions are false. It has done so.

DiLanzo argues Contiki cannot prevail absent a showing her defamatory statements were made with actual malice. In a public discussion involving a public figure, a speaker may not be held liable for making a false defamatory statement absent a showing of actual malice, i.e., a reckless disregard for the truth. (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254.) DiLanzo argues Contiki is a public figure because it enjoys "pervasive fame in the tour business," widely circulates publications covering tour safety, and has "access to the media." We disagree.

Public figures are those who "'have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.' [Citation.] This category is designated 'all purpose' public figure. [Citation.] All-purpose public figurehead will not be lightly assumed; in order for a plaintiff to be deemed an all-purpose public figure, there must be 'clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society . . . .' [Citation.] [¶] 'More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.' [Citation.] This 'limited purpose' or 'vortex' public figure is an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.' [Citation.] 'Unlike the "all purpose" public figure, the "limited purpose" public figure loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy.'" (*Stolz v. KSFM 102 FM* (1994) 30 Cal.App.4th 195, 203.)

Here, nothing in the record suggests Contiki has assumed a role of special prominence in the affairs of society or has thrust itself into the forefront of any particular public controversy, much less a controversy relating to DiLanzo's statements. Therefore, Contiki need not establish actual malice to prevail on its claims.

We note that Contiki adduces several actions by DiLanzo after the alleged rape by Jordan A. to argue the rape never occurred.  For example, DiLanzo engaged in consensual sex with Jordan A. twice after the rape, then met him for lunch in Philadelphia in December 2007, then stated in her 2008 resignation letter that working for Contiki was a positive experience for her.  DiLanzo denies that this evidence establishes the rape never occurred.  On the contrary, the actions were consistent with an acquaintance-rape victim's attempt to normalize a traumatic experience.

We need not resolve this matter, as it suffices that Contiki made a prima facie showing that DiLanzo's statements regarding *its* behavior were false.

## DISPOSITION

The order is affirmed.  Contiki is to recover its costs on appeal.

NOT TO BE PUBLISHED.

CHANEY, Acting P. J.

We concur:

JOHNSON, J.

BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.